**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

-------------------------------------------------------------------X

GARY SEIFRIT,

               Plaintiff,                             Civil Action No._____

     -against-

                                                      **COMPLAINT**

DOWNTOWN DEVELOPMENT AUTHORITY
OF THE CITY OF MIAMI,                         Plaintiff Demands A
ALYCE ROBERTSON, individually, and       Trial by Jury
CHRISTINA CRESPI, individually,

               Defendant.

-------------------------------------------------------------------X

## COMPLAINT

      Plaintiff, GARY SEIFRIT, by and through his undersigned counsel, and by way of this

Complaint seeks relief against Defendants  the DOWNTOWN DEVELOPMENT AUTHORITY

OF THE CITY OF MIAM, ALYCE ROBERTSON, and CHRISTINA CRESPI for violations of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e *et seq.* ("Title VII"),

and the Florida Civil Rights Act of 1992, Florida Statutes §§760.01-760.11 (the "FCRA"). In

support thereof, Plaintiff states as follows:

## JURISDICTION AND VENUE

1.    This is an action for monetary damages and all other appropriate relief as deemed by the

      court, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e

      *et seq.* ("Title VII"), and the Florida Civil Rights Act of 1992, Florida Statutes §§760.01-

      760.11 (the "FCRA").

2.      This Court has jurisdiction of the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding deprivation of Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e *et seq.* ("Title VII"), and the Florida Civil Rights Act of 1992, Florida Statutes §§760.01-760.11 (the "FCRA").

3.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) based upon the fact Defendants were located in this judicial district and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein occurred in this district. Plaintiff was employed by Defendant within Miami-Dade County, Florida. Additionally, the events took place in Miami-Dade County, Florida.

## PROCEDURAL PREREQUISITES

4.      Plaintiff has complied with all statutory prerequisites to file this action.

5.      On or about June 18, 2019, Plaintiff dual-filed charges with the EEOC and FCHR against Defendant as set forth herein.

6.      An EEOC filing automatically operates as a dual Florida Commission on Human Relations ("FCHR") filing.

7.      On or about October 24, 2019, the EEOC issued Plaintiff a Right to Sue Letter.

8.      This action is being commenced within ninety (90) days of receipt of the EEOC Right to Sue Letter.

**PARTIES**

9.    At all material times, Plaintiff GARY SEIFRIT (hereinafter referred to as "Plaintiff" and/ or "Mr. Seifrit") is an individual male who is a resident of the State of Florida and resides the Miami-Dade County, Florida.

10.   At all material times, Defendant DOWNTOWN DEVELOPMENT AUTHORITY OF THE CITY OF MIAMI (hereinafter "Defendant" and/or "DDA") is and was a corporation authorized, operating and licensed to do business in the State of Florida. Defendant is and has been a covered "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b) and the FCRA, at all times relevant to this Complaint. Defendant is a "person" within the meaning of 42 U.S.C. § 2000e(a).

11.   Defendant ALYCE ROBERTSON (hereinafter "Defendant" and/or "Robertson") is an individual adult woman residing within the State of Florida.

12.   Defendant CHRISTINA CRESPI (hereinafter "Defendant" and/or "Crespi") is an individual adult woman residing within the State of Florida.

**FACTUAL BACKGROUND**

13.   On April 1, 2019, DDA hired Plaintiff to serve as their "Senior Manager of Business Strategy and Development".

14.   Executive Director Alyce Robertson and Deputy Executive Director Christina Crespi supervised Plaintiff. Robertson and Crespi, at all times material hereto, held the power to hire and fire Mr. Seirfit.

15.   At all times relevant, Plaintiff is and was a devoted Christian and identifies as male.

3

16.  DDA management and staff are predominately non-Christian/ atheist. Approximately seventy percent (70%) of DDA employees are females. Both DDA Executive Director Robertson and Deputy Executive Director Crespi are female. Plaintiff was the sole male Senior Manager. Of the six (6) total Senior Manager positions, five (5) were occupied by females.

17.  Only four (4) days after starting his employment with DDA, on or about April 5, 2019, Robertson demanded Mr. Seifrit come to her office. Upon his arrival, Mr. Seifrit was chastised by Robertson. Per Robertson, Mr. Seifrit's speech "SEEMED TOO MALE AND AGGRESSIVE" when he reported that DDA's free transit pass system was not working. Robertson followed that degrading comment by advising Mr. Seifrit: "REMEMBER, WE ARE ALL MORE SENSITIVE HERE AT THE DDA". When Mr. Seifrit expressed concern and confusion, especially considering Robertson was not even present when Mr. Seifrit made the statement originating this conversation, Robertson claimed: "WELL, I JUST WANT YOU TO REMEMBER THAT YOU ARE A VERY STRONG MALE PRESENCE AND WE DDA EMPLOYEES ARE SENSITIVE." Robertson made clear that she was referring to the strong female presence at DDA.

18.  On or about April 10, 2019, Robertson once again summoned Mr. Seifrit to her office. This time Robertson claimed that Mr. Seifrit's belief that Earth changes and rising sea levels were God created had been brought to her attention. Robertson proceeded to berate Mr. Seifrit's religious beliefs by angrily exclaiming: "IT IS NOT GOD! YOU CANNOT HAVE THOSE OPINIONS AT THE DDA!"

19.  Robertson raised her voice and continued by announcing: "WE DO NOT ALLOW YOUR BELIEFS HERE AT THE DDA! IT IS NOT GOD! IT IS SCIENCE!" Shocked by her

comments and tone, Mr. Seifrit complained to Robertson, stating that that he felt Robertson was wrong to reprimand him for his faith/ Christian beliefs, which were not in any way impacting his performance at work. Robertson claimed she was not reprimanding him, but immediately contradicted herself by instructing Mr. Seifrit "TO *BE AWARE* THAT [HIS] BELIEFS ARE UNACCEPTABLE AT THE MIAMI DDA."

20. In or around Mid-April 2019, Mr. Seifrit was summoned for a third time to Robertson's office where Crespi was already present. In a condescending and accusatory tone, Crespi said they wanted to "bring to [Mr. Seifrit's] attention" that they did not like his "beliefs and values". Once again, a flabbergasted Mr. Seifrit questioned why he was being reprimanded for his personal beliefs about Faith and Christian values. In doing so, Mr. Seifrit again brought their attention how it does not in any way impact his performance at work. However, both Crespi and Robertson responded with: "YOUR BELIEFS HAVE BEEN BROUGHT TO OUR ATTENTION, AND THEY ARE UNACCEPTABLE."

21. At that time, Mr. Seifrit voiced his objection to how he was being treated by the female managers and employees at DDA. Specifically, he advised Crespi and Robertson that derogatory and hateful comments were being repeatedly and notoriously made about his Christian faith/ beliefs. Crespi and Robertson dismissed Mr. Seifrit's concerns. Nothing was ever done to address the hateful, threatening, and upsetting behavior of the female managers and employees at DDA.

22. Mr. Seifrit expressed to Crespi and Robertson that he believed it was wrong for them to reprimand him for his Christian beliefs/ faith; however, they claimed "this is not a reprimand", but they wanted him "to be aware" that they "DID NOT APPROVE" of his

Christian faith and beliefs. Mr. Seifrit left the meeting with Crespi and Robertson afraid, hurt, and disappointed.

23.     Following that meeting, Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult, if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, ask questions, or even request her signature on documents when Crespi's signature was necessary to finalize projects.

24.     Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespi and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

25.     The daily discriminatory and unfair treatment by Crespi and Robertson was so pervasive it made it more challenging for Mr. Seifrit to complete his job. Instead of meeting with him at all, Crespi would dismiss Mr. Seifrit or say, "WELL, JUST TEXT ME." Mr. Seifrit made multiple attempts to contact Crespi, but Crespi rarely responded. Meanwhile, Crespi and Robertson treated the female managers and employees at DDA with professionalism and responded as expected and appropriate in an office environment when Crespi and Robertson were present in the office, which was irregular at best.

26.     Unable to continue to tolerate the discriminatory, retaliatory, and demeaning behavior of Crespi and Robertson, Mr. Seifrit attempted to remedy the situation by confronting it directly, so he tried to meet with Crespi and Robertson. Mr. Seifrit went directly to Crespi's

office and asked to meet with Robertson, but Robertson was not in the office, so Mr. Seifrit met with Crespi instead.

27.   Mr. Seifrit explained to Crespi that he felt he was being treated differently from other managers and employees who were female as well as because of his Christian beliefs. He advised he felt he was being retaliated against as a result of his previous complaints. Crespi became agitated, avoided eye contact and fidgeted on her cellular telephone. She ultimately told Mr. Seifrit that he was mistaken, denying him the opportunity to resolve his concerns.

28.   After Crespi's denial of DDA's open and notorious discriminatory and retaliatory actions, Mr. Seifrit followed by inquiring whether Crespi and Robertson were satisfied with his performance at work. Crespi hesitated but admitted that they were happy with his work and then abruptly and dismissively asked him to leave her office.

29.   Subsequent to and as result of their meeting, Mr. Seifrit became increasingly concerned with Robertson and Crespi's comments and conduct. Other employees even made cautionary comments to Mr. Seifrit.

30.   By way of example and not meant to be an exhaustive list, one employee told Mr. Seifrit "TO BE CAREFUL" because Robertson "HAS IT OUT FOR YOU." Another employee stated: "YOU BETTER NOT LET ANYONE ELSE KNOW ABOUT YOUR RELIGIOUS BELIEFS HERE AT THE DDA. IF ALYCE [ROBERTSON] FINDS OUT, SHE'LL GET RID OF YOU."

31.   Mr. Seifrit sought to meet with Robertson directly, so he went to Robertson's office and otherwise attempted to reach her so they could meet. On or about May 10, 2019, following his numerous requests, Mr. Seifrit was finally able to get a meeting with Robertson to

discuss pending DDA matters. During the approximately hour and a half long meeting, Robertson seemed absent and was outright dismissive.

32.   Mr. Seifrit's meeting with Robertson was uncomfortable at best. Robertson gave Mr. Seifrit minimal comments on the DDA issues he sought to discuss. Further, Robertson did not provide adequate resources for Mr. Seifrit to accomplish his goals and Robertson's callous demeanor made it evident to Mr. Seifrit that she was not engaged or interested in the discussion. Mr. Seifrit was frustrated, defeated, and feeling hopeless, so he resolved to end the meeting and instead try again the following week.

33.   On or about May 13, 2019, despite numerous attempts to schedule additional time with Robertson, Robertson actively made herself unavailable. Robertson even ignored and avoided Mr. Seifrit.

34.   On or about May 14, 2019, Robertson advised Mr. Seifrit she wanted to meet with him. Initially, Mr. Seifrit was elated to be able to follow-up on the DDA matters he had attempted to meet with Robertson about the day prior, but when he arrived and both Crespi and Robertson were present, he grew weary.

35.   Mr. Seifrit took a seat at the table with Crespi and Robertson and started to pull out paperwork that he had wanted to review with Robertson, but he was told to put the paperwork away. "WE ARE FIRING YOU", Robertson abruptly stated.

36.   Shocked and confused, Mr. Seifrit requested a reason for the termination.  Mr. Seifrit emphatically stated that he was being terminated for what they had referred to as his "MALE MANAGEMENT STYLE" and due to his religious beliefs, that were different from other's at DDA.

37.   Mr. Seifrit felt defeated but told Robertson and Crespi that the termination was retaliatory and unlawful. Robertson threatened to humiliate Mr. Seifrit. She claimed she would expose him publicly. Confused, Mr. Seifrit asked what she was referring to and again pleaded "PLEASE EXPLAIN WHY YOU ARE FIRING ME."

38.   Robertson instead threatened Mr. Seifrit: "I WILL MAKE YOUR FIRING PUBLIC, AND YOU DON'T WANT ME TO DO THAT. IT WILL BE PUBLIC INFORMATION."

39.   Defendant DDA wrongfully and unlawfully terminated Mr. Seifrit, because of his gender and religious beliefs, and in retaliation for his objections to the unlawful and discriminatory treatment.

40.   Plaintiff further pleads, in the alternative that he was constructively discharged. During the course of the meeting with his supervisor, it was made clear to Mr. Seifrit that he was being wrongfully terminated and he felt he had no choice but to resign.

41.   As such Mr. Seifrit was constructively discharged on or around May 14, 2019. Defendant made conditions so onerous, abusive, and intolerable for Plaintiff that no individual in Plaintiff's shoes would have been expected to continue working under such conditions and such that Plaintiff choice to resign was void of choice or free will.

42.   As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

43.   As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

44.     As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages as against the Defendant.

45.     Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

46.     The above are just some examples, of some of the discrimination to which Defendant subjected Plaintiff.

47.     Defendant has exhibited a pattern and practice of not only discrimination but also retaliation.

**COUNT ONE**
**Cause of Action for Discrimination Under Title VII for Disparate Treatment Based on Plaintiff's Religion**
**(As to Defendant DDA Only)**

48.     Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

49.     At all times relevant, Plaintiff is and was a devoted Christian.

50.     DDA management and staff are predominately non-Christian/ atheist.

51.     At all times relevant, Plaintiff is and was a devoted Christian and identifies as male.

52.     DDA management and staff are predominately non-Christian/ atheist.

53.     On or about April 10, 2019, Robertson once again summoned Mr. Seifrit to her office. This time Robertson claimed that Mr. Seifrit's belief that Earth changes and rising sea levels were God created had been brought to her attention. Robertson proceeded to berate Mr. Seifrit's religious beliefs by angrily exclaiming: "IT IS NOT GOD! YOU CANNOT HAVE THOSE OPINIONS AT THE DDA!"

54.   Robertson raised her voice and continued by announcing: "WE DO NOT ALLOW YOUR BELIEFS HERE AT THE DDA! IT IS NOT GOD! IT IS SCIENCE!" Shocked by her comments and tone, Mr. Seifrit complained to Robertson, stating that that he felt Robertson was wrong to reprimand him for his faith/ Christian beliefs, which were not in any way impact his performance at work. Robertson claimed she was not reprimanding him, but immediately contradicted herself by instructing Mr. Seifrit "TO *BE AWARE* THAT [HIS] BELIEFS ARE UNACCEPTABLE AT THE MIAMI DDA."

55.   In or around Mid-April 2019, Mr. Seifrit was summoned for a third time to Robertson's office where Crespi was already present. In a condescending and accusatory tone, Crespi said they wanted to "bring to [Mr. Seifrit's] attention" that they did not like his "beliefs and values". Once again, a flabbergasted Mr. Seifrit questioned why he was being reprimanded for his personal beliefs about Faith and Christian values. In doing so, Mr. Seifrit again brought their attention to how it does not in any way impact his performance at work. However, both Crespi and Robertson responded with: "YOUR BELIEFS HAVE BEEN BROUGHT TO OUR ATTENTION, AND THEY ARE UNACCEPTABLE.

56.   At that time, Mr. Seifrit voiced his objection to how he was being treated by the female managers and employees at DDA. Specifically, he advised Crespi and Robertson that derogatory and hateful comments were being repeatedly and notoriously made about his faith/ beliefs. Crespi and Robertson dismissed Mr. Seifrit's concerns. Nothing was ever done to address the hateful, threatening, and upsetting behavior of the female managers and employees at DDA.

57.   Mr. Seifrit expressed to Crespi and Robertson that he believed it was wrong for them to reprimand him for his beliefs/ faith; however, they claimed "this is not a reprimand", but

they wanted him "to be aware" that they "DID NOT APPROVE" of his faith and beliefs. Mr. Seifrit left the meeting with Crespi and Robertson afraid, hurt, and disappointed.

58.     Following that meeting, Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult, if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, ask questions, or even get signatures on documents when Crespi's signature was necessary to finalize projects.

59.     Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespi and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

60.     Additionally, Crespi and Robertson actively avoided and ignored Mr. Seifrit whenever possible.

61.     Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*:

        "(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

62.     Defendant DDA engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating and by treating differently against Plaintiff because of his religion.

63. As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the Title VII, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

64. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

65. Conduct of Defendants and/or its agents deprived Plaintiff of him statutory rights guaranteed under federal law.

66. Plaintiff has been damaged by the illegal conduct of Defendant.

## COUNT TWO
**Cause of Action for Discrimination Under Title VII for Disparate Treatment Based on Plaintiff's Gender/Sex
(As to Defendant DDA Only)**

67. Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

68. Mr. Seifrit identifies as a male.

69. Approximately seventy percent (70%) of DDA employees are females. Both DDA Executive Director Robertson and Deputy Executive Director Crespi are female. Plaintiff was the sole male Senior Manager. Of the six (6) total Senior Manager positions, five (5) were occupied by females.

70. Only four (4) days after starting his employment with DDA, on or about April 5, 2019, Robertson demanded Mr. Seifrit come to her office. Upon his arrival, Mr. Seifrit was

chastised by Robertson. Per Robertson, Mr. Seifrit's speech "SEEMED TOO MALE AND AGGRESSIVE" when he reported that DDA's free transit pass system was not working. Robertson followed that degrading comment by advising Mr. Seifrit: "REMEMBER, WE ARE ALL MORE SENSITIVE HERE AT THE DDA". When Mr. Seifrit expressed concern and confusion, especially considering Robertson was not even present when Mr. Seifrit made the statement originating this conversation, Robertson claimed: "WELL, I JUST WANT YOU TO REMEMBER THAT YOU ARE A VERY STRONG MALE PRESENCE AND WE DDA EMPLOYEES ARE SENSITIVE." Robertson made clear that she was referring to the strong female presence at DDA.

71.    Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult, if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, answer questions, or even sign off on documents when Crespi's signature was necessary to finalize projects.

72.    Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespi and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

73.    The daily discriminatory and unfair treatment by Crespi and Robertson was so pervasive it made it more challenging for Mr. Seifrit to complete his job. Instead of meeting with him at all, Crespi would dismiss Mr. Seifrit or say, "WELL, JUST TEXT ME." Mr. Seifrit madew multiple attempts to contact Crespi, but she rarely responded. Meanwhile, Crespi and

Robertson treated the female managers and employees at DDA with professionalism and responded as expected and appropriate in an office environment when Crespi and Robertson were present in the office, which was irregular at best.

74. Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*:

"(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

75. Defendant DDA engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating and by treating differently against Plaintiff because of his sex/gender.

76. As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the Title VII, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

77. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

78. Conduct of Defendants and/or its agents deprived Plaintiff of him statutory rights guaranteed under federal law.

79. Plaintiff has been damaged by the illegal conduct of Defendant.

**COUNT THREE**
**Cause of Action for Discrimination Under Title VII for Hostile Work Environment Based on Plaintiff's Religion**
**(As to Defendant DDA Only)**

80.     Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

81.     At all times relevant, Plaintiff is and was a devoted Christian.

82.     DDA management and staff are predominately non-Christian/ atheist.

83.     On or about April 10, 2019, Robertson once again summoned Mr. Seifrit to her office. This time Robertson claimed that Mr. Seifrit's belief that Earth changes and rising sea levels were God created had been brought to her attention. Robertson proceeded to berate Mr. Seifrit's religious beliefs by angrily exclaiming: "IT IS NOT GOD! YOU CANNOT HAVE THOSE OPINIONS AT THE DDA!"

84.     Robertson raised her voice and continued by announcing: "WE DO NOT ALLOW YOUR BELIEFS HERE AT THE DDA! IT IS NOT GOD! IT IS SCIENCE!" Shocked by her comments and tone, Mr. Seifrit complained to Robertson, stating that that he felt Robertson was wrong to reprimand him for his faith/ Christian beliefs, which were not in any way impact his performance at work. Robertson claimed she was not reprimanding him, but immediately contradicted herself by instructing Mr. Seifrit "TO *BE AWARE* THAT [HIS] BELIEFS ARE UNACCEPTABLE AT THE MIAMI DDA."

85.     In or around Mid-April 2019, Mr. Seifrit was summoned for a third time to Robertson's office where Crespi was already present. In a condescending and accusatory tone, Crespi said they wanted to "bring to [Mr. Seifrit's] attention" that they did not like his "beliefs and values". Once again, a flabbergasted Mr. Seifrit questioned why he was being reprimanded for his personal beliefs about Faith and Christian values. In doing so, Mr. Seifrit again

brought their attention to how it does not in any way impact his performance at work. However, both Crespi and Robertson responded with: "YOUR BELIEFS HAVE BEEN BROUGHT TO OUR ATTENTION, AND THEY ARE UNACCEPTABLE.

86.  At that time, Mr. Seifrit voiced his objection to how he was being treated by the female managers and employees at DDA. Specifically, he advised Crespi and Robertson that derogatory and hateful comments were being repeatedly and notoriously made about his faith/ beliefs. Crespi and Robertson dismissed Mr. Seifrit's concerns. Nothing was ever done to address the hateful, threatening, and upsetting behavior of the female managers and employees at DDA.

87.  Mr. Seifrit expressed to Crespi and Robertson that he believed it was wrong for them to reprimand him for his beliefs/ faith; however, they claimed "this is not a reprimand", but they wanted him "to be aware" that they "DID NOT APPROVE" of his faith and beliefs. Mr. Seifrit left the meeting with Crespi and Robertson afraid, hurt, and disappointed.

88.  Following that meeting, Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult, if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, ask questions, or even get a signature on documents when Crespi's signature was necessary to finalize projects.

89.  Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespi and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

90.     Additionally, Crespi and Robertson actively avoided and ignored Mr. Seifrit whenever possible.

91.     Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*:

"(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

92.     Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against and harassing Plaintiff because of his religion.

93.     The harassing and comments and conduct directed at Plaintiff was sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's physical and/or psychological health, work performance and to create and intimidating, hostile and offensive working environment.

94.     As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the Title VII, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

95.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

96.    Conduct of Defendants and/or its agents deprived Plaintiff of his statutory rights guaranteed under federal law.

97.    Plaintiff has been damaged by the illegal conduct of Defendant.

**<u>COUNT FOUR</u>**
**Cause of Action for Discrimination Under Title VII for Hostile Work Environment Based on Plaintiff's Gender/Sex**
**(As to Defendant DDA Only)**

98.    Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

99.    Mr. Seifrit identifies as a male.

100.   Approximately seventy percent (70%) of DDA employees are females. Both DDA Executive Director Robertson and Deputy Executive Director Crespi are female. Plaintiff was the sole male Senior Manager. Of the six (6) total Senior Manager positions, five (5) were occupied by females.

101.   Only four (4) days after starting his employment with DDA, on or about April 5, 2019, Robertson demanded Mr. Seifrit come to her office. Upon his arrival, Mr. Seifrit was chastised by Robertson. Per Robertson, Mr. Seifrit's speech "SEEMED TOO MALE AND AGGRESSIVE" when he reported that DDA's free transit pass system was not working. Robertson followed that degrading comment by advising Mr. Seifrit: "REMEMBER, WE ARE ALL MORE SENSITIVE HERE AT THE DDA". When Mr. Seifrit expressed concern and confusion, especially considering Robertson was not even present when Mr. Seifrit made the statement originating this conversation, Robertson claimed: "WELL, I JUST WANT YOU TO REMEMBER THAT YOU ARE A VERY STRONG MALE PRESENCE

AND WE DDA EMPLOYEES ARE SENSITIVE." Robertson made clear that she was referring to the strong female presence at DDA.

102. Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult, if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, ask questions, or even get a signature on documents when Crespi's signature was necessary to finalize projects.

103. Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespi and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

104. The daily discriminatory and unfair treatment by Crespi and Robertson was so pervasive it made it more challenging for Mr. Seifrit to complete his job. Instead of meeting with him at all, Crespi would dismiss Mr. Seifrit or say, "WELL, JUST TEXT ME." Mr. Seifrit made multiple attempts to contact Crespi, but she rarely responded. Meanwhile, Crespi and Robertson treated the female managers and employees at DDA with professionalism and responded as expected and appropriate in an office environment when Crespi and Robertson were present in the office, which was irregular at best.

105. Title VII states in relevant parts as follows: § 2000e-2. *[Section 703]*:

"(a) Employer practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against

any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

106.   Defendant engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against and harassing Plaintiff because of his sex/gender.

107.   The harassing and comments and conduct directed at Plaintiff was sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's physical and/or psychological health, work performance and to create and intimidating, hostile and offensive working environment.

108.   As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the Title VII, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

109.   Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

110.   Conduct of Defendants and/or its agents deprived Plaintiff of his statutory rights guaranteed under federal law.

111.   Plaintiff has been damaged by the illegal conduct of Defendant.

**COUNT FIVE**
**Cause of Action for Retaliation Under Title VII**
**(As to Defendant DDA Only)**

112.   Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

113. Plaintiff complained of the discriminatory treatment he faced at DDA based on his gender/ sex and religious beliefs.

114. On or about May 14, 2019, Robertson advised Mr. Seifrit she wanted to meet with him. Initially, Mr. Seifrit was elated to be able to follow-up on the DDA matters he'd attempted to meet with Robertson about the day prior, but when he arrived and both Crespi and Robertson were present, he grew weary.

115. Mr. Seifrit took a seat at the table with Crespi and Robertson and started to pull out paperwork that he had wanted to review with Robertson, but he was told to put the paperwork away. "WE ARE FIRING YOU", Robertson abruptly stated.

116. Shocked and confused, Mr. Seifrit requested a reason for the termination.  Mr. Seifrit emphatically stated that he was being terminated for what they had referred to as his "MALE MANAGEMENT STYLE" and due to his religious beliefs, that were different from other's at DDA.

117. Mr. Seifrit felt defeated but told Robertson and Crespi that the termination was retaliatory and unlawful. Robertson threatened to humiliate Mr. Seifrit. She claimed she would expose him publicly. Confused, Mr. Seifrit asked what she was referring to and again pleaded "PLEASE EXPLAIN WHY YOU ARE FIRING ME."

118. Robertson instead threatened Mr. Seifrit: "I WILL MAKE YOUR FIRING PUBLIC, AND YOU DON'T WANT ME TO DO THAT. IT WILL BE PUBLIC INFORMATION."

119. Defendant DDA wrongfully and unlawfully terminated Mr. Seifrit, because of his gender and religious beliefs, and in retaliation for his objections to the unlawful and discriminatory treatment.

120.   Plaintiff further pleads, in the alternative that he was constructively discharged. During the course of the meeting with his supervisor, it was made clear to Mr. Seifrit that he was being wrongfully terminated and he felt he had no choice but to resign.

121.   As such Mr. Seifrit was constructively discharged on or around May 14, 2019. Defendant made conditions so onerous, abusive, and intolerable for Plaintiff that no individual in Plaintiff's shoes would have been expected to continue working under such conditions and such that Plaintiff choice to resign was void of choice or free will.

122.   At all times relevant, Plaintiff acted in good faith and with the objective and subjective belief that violations by Defendants' employees of Title VII had occurred.

123.   At all times relevant, the unlawful discrimination by Defendants' employees against Plaintiff in the terms and conditions of his employment because his opposed a practice made unlawful by Title VII which would not have occurred but for that opposition.

124.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. $2000e-3(a) provides that it shall be unlawful employment practice for an employer:

> "(1) to … discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

125.   Defendants engaged in unlawful employment practice prohibited by 42 U.S.C. $2000e *et seq*. by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of his opposition to the unlawful employment practices of Defendants.

126.   At all times relevant, Defendant's employees acted intentionally and with reckless disregard of Plaintiff's rights protected by Title VII.

127. At all material times, the employer exhibiting discriminatory conduct against Plaintiff possessed the authority to affect the terms, conditions and privileges of Plaintiff's employment with the Defendant.

128. As a direct and proximate result of Defendants' intentional retaliatory conduct in violation of the Title VII, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

129. Defendant's actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the Title VII, warranting the imposition of punitive damages in addition to compensatory damages.

130. Conduct of Defendants and/or its agents deprived Plaintiff of his statutory rights guaranteed under federal law.

131. Plaintiff has been damaged by the illegal conduct of Defendants.

132. At all times material, Defendants allowed the harassing and discriminatory practices to continue in the work environment.

133. Defendants failed to take prompt remedial action to correct the harassment.

## **COUNT SIX**
**Cause of Action for Discrimination Under FCRA for Disparate Treatment Based on Plaintiff's Religion**

134. Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

135. At all times relevant, Plaintiff is and was a devoted Christian.

136. DDA management and staff are predominately non-Christian/ atheist.

137.     On or about April 10, 2019, Robertson once again summoned Mr. Seifrit to her office. This
          time Robertson claimed that Mr. Seifrit's belief that Earth changes and rising sea levels
          were God created had been brought to her attention. Robertson proceeded to berate Mr.
          Seifrit's religious beliefs by angrily exclaiming: "IT IS NOT GOD! YOU CANNOT HAVE
          THOSE OPINIONS AT THE DDA!"

138.     Robertson raised her voice and continued by announcing: "WE DO NOT ALLOW YOUR
          BELIEFS HERE AT THE DDA! IT IS NOT GOD! IT IS SCIENCE!" Shocked by her
          comments and tone, Mr. Seifrit complained to Robertson, stating that that he felt Robertson
          was wrong to reprimand him for his faith/ Christian beliefs, which were not in any way
          impact his performance at work. Robertson claimed she was not reprimanding him, but
          immediately contradicted herself by instructing Mr. Seifrit "TO *BE AWARE* THAT [HIS]
          BELIEFS ARE UNACCEPTABLE AT THE MIAMI DDA."

139.     In or around Mid-April 2019, Mr. Seifrit was summoned for a third time to Robertson's
          office where Crespi was already present. In a condescending and accusatory tone, Crespi
          said they wanted to "bring to [Mr. Seifrit's] attention" that they did not like his "beliefs and
          values". Once again, a flabbergasted Mr. Seifrit questioned why he was being reprimanded
          for his personal beliefs about Faith and Christian values. In doing so, Mr. Seifrit again
          brought their attention to how it does not in any way impact his performance at work.
          However, both Crespi and Robertson responded with: "YOUR BELIEFS HAVE BEEN
          BROUGHT TO OUR ATTENTION, AND THEY ARE UNACCEPTABLE.

140.     At that time, Mr. Seifrit voiced his objection to how he was being treated by the female
          managers and employees at DDA. Specifically, he advised Crespi and Robertson that
          derogatory and hateful comments were being repeatedly and notoriously made about his

faith/ beliefs. Crespi and Robertson dismissed Mr. Seifrit's concerns. Nothing was ever done to address the hateful, threatening, and upsetting behavior of the female managers and employees at DDA.

141.   Mr. Seifrit expressed to Crespi and Robertson that he believed it was wrong for them to reprimand him for his beliefs/ faith; however, they claimed "this is not a reprimand", but they wanted him "to be aware" that they "DID NOT APPROVE" of his faith and beliefs. Mr. Seifrit left the meeting with Crespi and Robertson afraid, hurt, and disappointed.

142.   Following that meeting, Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult, if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, ask questions, or even get a signature on documents when Crespi's signature was necessary to finalize projects.

143.   Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespi and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

144.   Additionally, Crespi and Robertson actively avoided and ignored Mr. Seifrit whenever possible.

145.   The FCRA prohibits Defendant Company from discriminating against Plaintiff because of his religion, with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

146. Defendants violated the FCRA by discriminating against Plaintiff based his religion, of which the Defendants were fully aware of.

147. As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the FCRA, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

148. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

149. Conduct of Defendants and/or their agents deprived Plaintiff of his statutory rights guaranteed under state law.

150. Plaintiff has been damaged by the illegal conduct of Defendants.

## COUNT SEVEN
### Cause of Action for Discrimination Under FCRA for Disparate Treatment Based on Plaintiff's Gender/Sex

151. Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

152. Mr. Seifrit identifies as a male.

153. Approximately seventy percent (70%) of DDA employees are females. Both DDA Executive Director Robertson and Deputy Executive Director Crespi are female. Plaintiff was the sole male Senior Manager. Of the six (6) total Senior Manager positions, five (5) were occupied by females.

154.    Only four (4) days after starting his employment with DDA, on or about April 5, 2019, Robertson demanded Mr. Seifrit come to her office. Upon his arrival, Mr. Seifrit was chastised by Robertson. Per Robertson, Mr. Seifrit's speech "SEEMED TOO MALE AND AGGRESSIVE" when he reported that DDA's free transit pass system was not working. Robertson followed that degrading comment by advising Mr. Seifrit: "REMEMBER, WE ARE ALL MORE SENSITIVE HERE AT THE DDA". When Mr. Seifrit expressed concern and confusion, especially considering Robertson was not even present when Mr. Seifrit made the statement originating this conversation, Robertson claimed: "WELL, I JUST WANT YOU TO REMEMBER THAT YOU ARE A VERY STRONG MALE PRESENCE AND WE DDA EMPLOYEES ARE SENSITIVE." Robertson made clear that she was referring to the strong female presence at DDA.

155.    Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult, if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, ask questions, or even get a signature on documents when Crespi's signature was necessary to finalize projects.

156.    Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespi and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

157.    The daily discriminatory and unfair treatment by Crespi and Robertson was so pervasive it made it more challenging for Mr. Seifrit to complete his job. Instead of meeting with him at

all, Crespi would dismiss Mr. Seifrit or say, "WELL, JUST TEXT ME." Mr. Seifrit made multiple attempts to contact Crespi, but Crespi rarely responded. Meanwhile, Crespi and Robertson treated the female managers and employees at DDA with professionalism and responded as expected and appropriate in an office environment when Crespi and Robertson were present in the office, which was irregular at best.

158. The FCRA prohibits Defendant Company from discriminating against Plaintiff because of his sex/gender, with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

159. Defendants violated the FCRA by discriminating against Plaintiff based his gender/sex, of which the Defendants were fully aware of.

160. As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the FCRA, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

161. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

162. Conduct of Defendants and/or their agents deprived Plaintiff of his statutory rights guaranteed under state law.

163. Plaintiff has been damaged by the illegal conduct of Defendants.

**COUNT EIGHT**

**Cause of Action for Discrimination Under FCRA for Hostile Work Environment Based on Plaintiff's Religion**

164. Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

165. At all times relevant, Plaintiff is and was a devoted Christian.

166. DDA management and staff are predominately non-Christian/ atheist.

167. On or about April 10, 2019, Robertson once again summoned Mr. Seifrit to her office. This time Robertson claimed that Mr. Seifrit's belief that Earth changes and rising sea levels were God created had been brought to her attention. Robertson proceeded to berate Mr. Seifrit's religious beliefs by angrily exclaiming: "IT IS NOT GOD! YOU CANNOT HAVE THOSE OPINIONS AT THE DDA!"

168. Robertson raised her voice and continued by announcing: "WE DO NOT ALLOW YOUR BELIEFS HERE AT THE DDA! IT IS NOT GOD! IT IS SCIENCE!" Shocked by her comments and tone, Mr. Seifrit complained to Robertson, stating that that he felt Robertson was wrong to reprimand him for his faith/ Christian beliefs, which were not in any way impact his performance at work. Robertson claimed she was not reprimanding him, but immediately contradicted herself by instructing Mr. Seifrit "TO *BE AWARE* THAT [HIS] BELIEFS ARE UNACCEPTABLE AT THE MIAMI DDA."

169. In or around Mid-April, 2019, Mr. Seifrit was summoned for a third time to Robertson's office where Crespi was already present. In a condescending and accusatory tone, Crespi said they wanted to "bring to [Mr. Seifrit's] attention" that they did not like his "beliefs and values". Once again, a flabbergasted Mr. Seifrit questioned why he was being reprimanded for his personal beliefs about Faith and Christian values. In doing so, Mr. Seifrit again

brought their attention to how it does not in any way impact his performance at work. However, both Crespi and Robertson responded with: "YOUR BELIEFS HAVE BEEN BROUGHT TO OUR ATTENTION, AND THEY ARE UNACCEPTABLE.

170.   At that time, Mr. Seifrit voiced his objection to how he was being treated by the female managers and employees at DDA. Specifically, he advised Crespi and Robertson that derogatory and hateful comments were being repeatedly and notoriously made about his faith/ beliefs. Crespi and Robertson dismissed Mr. Seifrit's concerns. Nothing was ever done to address the hateful, threatening, and upsetting behavior of the female managers and employees at DDA.

171.   Mr. Seifrit expressed to Crespi and Robertson that he believed it was wrong for them to reprimand him for his beliefs/ faith; however, they claimed "this is not a reprimand", but they wanted him "to be aware" that they "DID NOT APPROVE" of his faith and beliefs. Mr. Seifrit left the meeting with Crespi and Robertson afraid, hurt, and disappointed.

172.   Following that meeting, Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult, if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, ask questions, or even get a signature on documents when Crespi's signature was necessary to finalize projects.

173.   Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespit and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

174.     Additionally, Crespi and Robertson actively avoided and ignored Mr. Seifrit whenever possible.

175.     The FCRA prohibits Defendant Company from discriminating against Plaintiff because of his religion, with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

176.     Defendants violated the FCRA by subjecting Plaintiff to an unlawful conduct and comments based his religion, of which the Defendants were fully aware of.

177.     The harassing and discriminatory comments and conduct directed at Plaintiff were sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's physical and/or psychological health, work performance and to create and intimidating, hostile and offensive working environment.

178.     As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the FCRA, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

179.     Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

180.     Conduct of Defendants and/or their agents deprived Plaintiff of his statutory rights guaranteed under state law.

181.     Plaintiff has been damaged by the illegal conduct of Defendants.

**COUNT NINE**

**Cause of Action for Discrimination Under FCRA for Hostile Work Environment Based on Plaintiff's Gender/Sex**

182.  Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

183.  Mr. Seifrit identifies as a male.

184.  Approximately seventy percent (70%) of DDA employees are females. Both DDA Executive Director Robertson and Deputy Executive Director Crespi are female. Plaintiff was the sole male Senior Manager. Of the six (6) total Senior Manager positions, five (5) were occupied by females.

185.  Only four (4) days after starting his employment with DDA, on or about April 5, 2019, Robertson demanded Mr. Seifrit come to her office. Upon his arrival, Mr. Seifrit was chastised by Robertson. Per Robertson, Mr. Seifrit's speech "SEEMED TOO MALE AND AGGRESSIVE" when he reported that DDA's free transit pass system was not working. Robertson followed that degrading comment by advising Mr. Seifrit: "REMEMBER, WE ARE ALL MORE SENSITIVE HERE AT THE DDA". When Mr. Seifrit expressed concern and confusion, especially considering Robertson was not even present when Mr. Seifrit made the statement originating this conversation, Robertson claimed: "WELL, I JUST WANT YOU TO REMEMBER THAT YOU ARE A VERY STRONG MALE PRESENCE AND WE DDA EMPLOYEES ARE SENSITIVE." Robertson made clear that she was referring to the strong female presence at DDA.

186.  Crespi and Robertson further discriminated and began to retaliate against Mr. Seifrit by intentionally adding obstacles and making it more difficult for Mr. Seifrit at DDA. By way of example, Crespi began openly avoiding Mr. Seifrit. In doing so, Crespi made it difficult,

if not impossible, for Mr. Seifrit to schedule a meeting to discuss DDA business, ask questions, or even get a signature on documents when Crespi's signature was necessary to finalize projects.

187. Crespi and Robertson's hostility also led to embarrassing situations for Mr. Seifrit. For example, they would silence him during DDA meetings with other managers and employees. Crespi and Robertson actively took steps to ostracize, isolate and publicly humiliate Mr. Seifrit.

188. The daily discriminatory and unfair treatment by Crespi and Robertson was so pervasive it made it more challenging for Mr. Seifrit to complete his job. Instead of meeting with him at all, Crespi would dismiss Mr. Seifrit or say, "WELL, JUST TEXT ME." Mr. Seifrit made multiple attempts to contact Crespi, but Crespi rarely responded. Meanwhile, Crespi and Robertson treated the female managers and employees at DDA with professionalism and responded as expected and appropriate in an office environment when Crespi and Robertson were present in the office, which was irregular at best.

189. The FCRA prohibits Defendant Company from discriminating against Plaintiff because of his sex/gender, with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

190. Defendants violated the FCRA by subjecting Plaintiff to unlawful conduct and comments based his gender/sex, of which the Defendants were fully aware of.

191. The harassing and discriminatory comments and conduct directed at Plaintiff were sufficiently severe and pervasive so as to unreasonably interfere with Plaintiff's physical and/or psychological health, work performance and to create and intimidating, hostile and offensive working environment.

192. As a direct and proximate result of Defendants' intentional discriminatory conduct in violation of the FCRA, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

193. Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

194. Conduct of Defendants and/or their agents deprived Plaintiff of his statutory rights guaranteed under state law.

195. Plaintiff has been damaged by the illegal conduct of Defendants.

## COUNT TEN
### Cause of Action for Retaliation Under FCRA

196. Plaintiff incorporates by reference herein and re-alleges the allegations in Paragraph 1 through 47 above as though set forth fully herein.

197. Plaintiff complained of the discriminatory treatment he faced at DDA based on his gender/ sex and religious beliefs.

198. On or about May 14, 2019, Robertson advised Mr. Seifrit she wanted to meet with him. Initially, Mr. Seifrit was elated to be able to follow-up on the DDA matters he'd attempted to meet with Robertson about the day prior, but when he arrived and both Crespi and Robertson were present, he grew weary.

199.  Mr. Seifrit took a seat at the table with Crespi and Robertson and started to pull out paperwork that he had wanted to review with Robertson, but he was told to put the paperwork away. "WE ARE FIRING YOU", Robertson abruptly stated.

200.  Shocked and confused, Mr. Seifrit requested a reason for the termination.  Mr. Seifrit emphatically stated that he was being terminated for what they had referred to as his "MALE MANAGEMENT STYLE" and due to his religious beliefs, that were different from other's at DDA.

201.  Mr. Seifrit felt defeated but told Robertson and Crespi that the termination was retaliatory and unlawful. Robertson threatened to humiliate Mr. Seifrit. She claimed she would expose him publicly. Confused, Mr. Seifrit asked what she was referring to and again pleaded "PLEASE EXPLAIN WHY YOU ARE FIRING ME."

202.  Robertson instead threatened Mr. Seifrit: "I WILL MAKE YOUR FIRING PUBLIC, AND YOU DON'T WANT ME TO DO THAT. IT WILL BE PUBLIC INFORMATION."

203.  Defendant DDA wrongfully and unlawfully terminated Mr. Seifrit, because of his gender and religious beliefs, and in retaliation for his objections to the unlawful and discriminatory treatment.

204.  Plaintiff further pleads, in the alternative that he was constructively discharged. During the course of the meeting with his supervisor, it was made clear to Mr. Seifrit that he was being wrongfully terminated and he felt he had no choice but to resign.

205.  As such Mr. Seifrit was constructively discharged on or around May 14, 2019. Defendant made conditions so onerous, abusive, and intolerable for Plaintiff that no individual in Plaintiff's shoes would have been expected to continue working under such conditions and such that Plaintiff choice to resign was void of choice or free will.

206. At all times relevant, Plaintiff acted in good faith and with the objective and subjective belief that violations by Defendants' employees of FCRA had occurred.

207. At all times material, Defendants allowed the harassing and discriminatory practices to continue in the work environment.

208. Defendants failed to take prompt remedial action to correct the harassment.

209. At all times relevant, the unlawful discrimination by Defendants' employees against Plaintiff in the terms and conditions of his employment because he opposed a practice made unlawful by FCRA which would not have occurred but for that opposition.

210. Defendants engaged in unlawful employment practice prohibited by the FCRA by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of his opposition to the unlawful employment practices of Defendants.

211. At all times relevant, Defendants' employees acted intentionally and with reckless disregard of Plaintiff's rights protected by FCRA.

212. At all material times, the employer exhibiting discriminatory conduct against Plaintiff possessed the authority to affect the terms, conditions and privileges of Plaintiff's employment with Defendants.

213. As a direct and proximate result of Defendants' intentional retaliatory conduct in violation of the FCRA, Plaintiff suffered and will continue to suffer damages including lost wages and benefits, severe emotional distress, mental anguish, suffering, loss of dignity, humiliation, embarrassment, loss of reputation, and other pecuniary and non-pecuniary losses.

214.   Defendants' actions were knowing, intentional, willful, malicious, and in reckless disregard of Plaintiff's rights under the FCRA, warranting the imposition of punitive damages in addition to compensatory damages.

215.   Conduct of Defendants and/or its agents deprived Plaintiff of his statutory rights guaranteed under federal law.

216.   Plaintiff has been damaged by the illegal conduct of Defendants.

**JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendant in an amount to be determined at the time of trial plus interest, including, but not limited to, all emotional distress, back pay and front pay, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:  January 22, 2020
    Miami, Florida

**DEREK SMITH LAW GROUP, PLLC**
*Attorneys for Plaintiff*

/s/ Sarah Waters_____
Sarah Waters, Esquire
Bar No. 118496
701 Brickell Avenue, Suite 1310
Miami, Florida 33131
Tel. (305) 946-1884
swaters@dereksmithlaw.com